## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **MESHA L. GARCIA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 12-1030-JWL** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security (hereinafter Commissioner) denying Social Security disability benefits (SSD) under sections 216(i) and 223 of the Social Security Act.  42 U.S.C. §§ 416(i) and 423 (hereinafter the Act).  Finding no error in the Commissioner's final decision, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING that decision.

**I.      Background**

Plaintiff applied for SSD on January 24, 2008, alleging disability beginning February 8, 2007.  (R. 11, 136-43).  The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (R. 11, 49-50, 58-59).  Plaintiff's request was granted, and Plaintiff appeared with

counsel for a hearing before ALJ Debra Bice on June 28, 2010.  (R. 24-48).  At the
hearing, testimony was taken from Plaintiff and from a vocational expert.  (R. 9, 423-24).
ALJ Bice issued her decision on August 24, 2010 finding that although Plaintiff cannot
perform her past relevant work as a floral designer because of vision problems remaining
after repair of a detached retina, there are jobs that exist in significant numbers in the
economy that she can perform, represented by work such as a blood donor clerk, a locker
room attendant, or a folding machine operator.  (R. 11-19).  Therefore, the ALJ
determined that Plaintiff is not disabled within the meaning of the Act, and denied her
application.  (R. 19).

Plaintiff disagreed with the ALJ's determination, sought review of the decision by
the Appeals Council, and submitted a representative brief to the Council.  (R. 6, 7, 244-
45).  The Appeals Council issued an order making the representative brief a part of the
administrative record, and considered that brief in determining whether to grant the
request for review.  (R. 2, 5).  The Council determined that the representative brief did not
provide a basis to change the ALJ's decision, found no reason under the rules of the
Social Security Administration to review the ALJ's decision, and denied Plaintiff's
request.  (R. 1-5).  Consequently, the ALJ's decision is the final decision of the
Commissioner.  (R. 1); Blea v. Barnhart, 466 F.3d 903, 908 (10th Cir. 2006).  Plaintiff
now seeks judicial review of that decision. (Doc. 1).

## II.    Legal Standard

The court's jurisdiction and review are guided by the Act.  Weinberger v. Salfi, 422 U.S. 749, 763 (1975) (citing 42 U.S.C. § 405(g)); Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009) (same); Brandtner v. Dep't of Health and Human Servs., 150 F.3d 1306, 1307 (10th Cir. 1998) (sole jurisdictional basis in social security cases is 42 U.S.C. § 405(g)).  Section 405(g) of the Act provides for review of a final decision of the Commissioner made after a hearing in which the Plaintiff was a party.  It also provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court must determine whether the factual findings are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). Substantial evidence is more than a scintilla, but it is less than a preponderance; it is such evidence as a reasonable mind might accept to support a conclusion.  Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).  The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).  Whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

An individual is under a disability only if that individual can establish that she has a physical or mental impairment which prevents her from engaging in any substantial gainful activity, and which is expected to result in death or to last for a continuous period of at least twelve months.  Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir. 1985) (quoting identical definitions of a disabled individual from both 42 U.S.C. §§ 423(d)(1) and 1382c(a)(3)(A)); accord, Lax, 489 F.3d at 1084 (citing 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)).  The claimant's impairments must be of such severity that she is not only unable to perform her past relevant work, but cannot, considering her age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step sequential process to evaluate disability.  20 C.F.R. §§ 404.1520, 416.920 (2010);[1] Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has a severe impairment(s), and whether the severity of her impairment(s) meets or equals

---

[1]The Commissioner's decision in this case was issued on August 24, 2010, and unless otherwise noted, every citation to the Code of Federal Regulations in this opinion refers to the 2010 edition of 20 C.F.R. Parts 400 to 499, Revised as of April 1, 2010.

the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1). Williams, 844 F.2d at 750-51. After evaluating step three, the Commissioner assesses claimant's residual functional capacity (RFC). 20 C.F.R. §§ 404.1520(e), 416.920(e). This assessment is used at both step four and step five of the sequential evaluation process. Id.

The Commissioner next evaluates steps four and five of the sequential process-- determining whether claimant can perform past relevant work; and whether, considering vocational factors of age, education, and work experience, claimant is able to perform other work in the economy. Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In steps one through four the burden is on claimant to prove a disability that prevents performance of past relevant work. Blea, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2. At step five, the burden shifts to the Commissioner to show there are jobs in the economy within Plaintiff's RFC. Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

Plaintiff claims the ALJ erred in three respects in assessing RFC and also erred in evaluating the credibility of her allegations of symptoms. The Commissioner argues that the ALJ properly considered the credibility of Plaintiff allegations, properly evaluated the medical opinions, and properly assessed Plaintiff's RFC in accordance with the regulations and the record evidence. The court addresses each issue in the order presented in Plaintiff's brief, and finds no error.

## III.   The ALJ's RFC Assessment

5

Plaintiff claims the ALJ erred in three respects in assessing Plaintiff's RFC.  First, she claims that the ALJ purportedly accorded "great weight" to the opinion of her treating physician, Dr. Schelm, but then deviated from that opinion in assessing RFC without properly explaining her basis for doing so.  Second, Plaintiff claims the ALJ misunderstood Dr. Schelm's report of anisometropia, and thereby failed to properly consider all of its associated limitations.  Finally, she claims error in the ALJ's determination to accord "little weight" to the opinion of her family physician, Dr. Burns, regarding visual limitations.  The Commissioner argues that the ALJ appropriately accorded "great weight" to Dr. Schelm's opinion that Plaintiff had marked constriction of her peripheral vision and constricted field of view on the right with decreased visual acuity, no color vision,[2] and no or poor depth perception.  He also notes that Dr. Burns opined that Plaintiff could see rarely and not repetitiously, and argues that the ALJ properly resolved the conflict between Dr. Schelm's opinion and Dr. Burns's opinion by according "little weight" to Dr. Burns's opinion.

---

[2]In the decision, the ALJ summarized Dr. Schelm's opinion, and stated that Dr. Schelm found Plaintiff has "no color vision."  (R. 15).  The Commissioner cites to this summary in his brief.  (Comm'r Br. 8) (citing R. 15, 424).  However, this appears to be merely a typographical error in the decision.  Dr. Schelm's opinion explains that when taking the color vision test Plaintiff missed several plates with the right eye, indicating "both blue-yellow & red-green defect," but that the "left eye was normal."  (R. 424).  Dr. Schelm then summarized her opinion:  "Ms. Garcia has decreased acuity in the right eye, constricted visual fields and poor color vision and no/poor depth perception."  (R. 424).  The ALJ's RFC presupposes that Plaintiff has some color vision (R. 15) ("occasional color discrimination"), and she later correctly summarized Dr. Schelm's opinion that Plaintiff has "poor color vision."  (R. 17) (citing Ex. 17F (R. 423-28)).

A.      **Failure to Explain Deviation From Dr. Schelm's Opinion**

As Plaintiff argues, the ALJ summarized Dr. Schelm's opinion and accorded it

"great weight:"

> The claimant's treating optometrist issued a statement dated June 24, 2010
> that the claimant had marked constr[i]ction of her peripheral vision and
> constricted field of vision on the right with decreased vision acu[it]y.  She
> was also noted to have [poor][3] color vision and no or poor depth perception
> (Exhibit 17F [(R. 423-28)]).  The opinions of the eye specialist are given
> great weight.

(R. 15).  Plaintiff also points out that based upon Plaintiff's visual impairment, the ALJ

assessed nonexertional limitations including:  no work in hazardous environments, no

operation of motor vehicles or dangerous machinery, no use of knives or sharp objects,

and no more than occasional use of near visual acuity, color discrimination, and depth

perception.  (Pl. Br. 9) (citing R. 15, finding no. 5).

Plaintiff asserts that although the ALJ purportedly accorded "great weight" to Dr.

Schelm's opinion, her "RFC differs from Dr. Schelm's opinion without explanation."  (Pl.

Br. 9).  Specifically, she argues, "Dr. Schelm noted that Garcia had poor/no depth

---

[3]As noted in footnote 2, the ALJ's statement that Dr. Schelm opined that Plaintiff
had "no color vision," was a typographical error, and the court has corrected the
typographical errors in this quotation.  The ALJ summarized Dr. Schelm's opinion
properly at a later point in her decision:  "The overwhelming medical evidence documents
that the claimant has restricted vision in the right eye but that she maintains corrected
vision to normal in the left eye.  She has constricted right visual field, poor color vision
and no or poor depth perception."  (R. 17) (citing Ex. 17F (R. 423-28)).  Plaintiff does not
base her argument on the ALJ's erroneous assertion that Plaintiff has "no color vision."
Rather, she argues that the RFC assessed deviates without explanation from Dr. Schelm's
opinion that Plaintiff has "poor/no depth perception and poor color vision."  (Pl. Br. 10).

perception and poor color vision.  ([R.] 424).  Yet, the ALJ opined that Garcia had the ability to occasionally perform both color discrimination and depth perception.  ([R.] 15)." (Pl. Br. 10).  Plaintiff notes that the RFC assessment prepared at the initial review by a single decision maker (SDM) and affirmed as written at the reconsideration review by a state agency physician restricts Plaintiff to occasional depth perception, and that the ALJ stated she did not give great weight to that assessment because Dr. Schelm's opinion indicated more limitations.  Id., at 10-11.  She argues that the ALJ must have credited the state agency RFC assessment over Dr. Schelm's opinion regarding depth perception without explaining why she did so.  Id., at 11.  Plaintiff asserts that because the ALJ purportedly relied upon Dr. Schelm's opinion but assessed an RFC which deviates from that opinion without explaining her reason for the deviation, she erred, and remand is necessary for a proper explanation of the deviation.  Id. (citing Brown v. Comm'r of the Soc. Sec. Admin., 245 F. Supp. 2d 1175, 1186 (D. Kan. 2003)).  The court does not agree.

The problem with Plaintiff's argument is that she has not shown a difference or a deviation between Dr. Schelm's opinion and the RFC assessed by the ALJ.  As Plaintiff argues, Dr. Schelm found that Plaintiff has "poor color vision and no/poor depth perception."  (R. 424).  However, Plaintiff has not shown in the circumstances of this case how that opinion precludes, differs from, or deviates from, the ALJ's assessment of the ability for "no more than occasional color discrimination; and no more than occasional depth perception."  (R. 15).  As discussed above, Dr. Schelm opined that Plaintiff's left

eye was normal with regard to color vision.  (R. 424).  Plaintiff has shown no basis to preclude occasional color discrimination based on one eye with normal color vision.

With regard to depth perception, Dr. Schelm opined that Plaintiff has "no/poor depth perception."  But, that opinion is equivocal and does not on its face preclude "no more than occasional depth perception."  Moreover, Plaintiff believes she has sufficient depth perception to drive an automobile and the record suggests Dr. Schelm does not oppose Plaintiff's driving.  At the hearing Plaintiff reported that she drives to the grocery store and to pick her son up from school, but that she does not drive at night.  (R. 29). The ALJ specifically asked Plaintiff, "Have your doctors reported your visual problems at all to the Department of Motor Vehicles?"  Id.  Plaintiff responded that Dr. Schelm[4] was curious about her driving, but that to her knowledge Dr. Schelm had not reported the issue to the Department of Motor Vehicles.  (R. 30).  On these facts, it was reasonable for the ALJ to find that Plaintiff's "doctor has not yet restricted her driving" (R. 16), and to rely on that finding to determine that Dr. Schelm's opinion permits depth perception on a no-more-than-occasional basis.  Plaintiff simply has not shown that the ALJ's RFC assessment is different than or deviates from the opinion expressed by Dr. Schelm. Therefore, the evidence supports the ALJ's determination to accord "great weight" to Dr.

---

[4]Plaintiff did not refer to Dr. Schelm by name at this point in the hearing, but Dr. Schelm is Plaintiff's treating optometrist, Plaintiff referred to the doctor who was curious about her driving as "she," and Dr. Schelm is the only female eye doctor reflected in the medical records who has treated Plaintiff.

Schelm's opinion, and there is no need for the ALJ to explain an alleged discrepancy which is not apparent in the facts or in the record evidence.

### B.      Misunderstanding Dr. Schelm's Treatment Notes

Plaintiff points out that in summarizing the medical evidence, the ALJ acknowledged that Plaintiff "had problems with anisometropia, or double vision." (Pl. Br. 11 (citing R. 15). She argues that "anisometropia is not double vision, but is a condition where there is a significant difference between the refractive power of the two eyes." Id. (citing the Attorney's Illustrated Medical Dictionary A38 (West 1997)). Plaintiff argues that the "evidence indicates that Garcia's anisometropia causes more that just double vision," id., and that "Dr. Schelm's treatment notes reveal that as a result of anisometropia, Garcia was unable to find contacts to correct her vision and suffered not only from double vision, but also from headaches, blurred vision in both the right and left eye, and bright flashes of light." Id. (citing R. 308, 309, 343, 347). Plaintiff concludes her argument, "The ALJ's misunderstanding of Garcia's condition results in a failure to properly consider all of the symptoms associated with anisometropia." Id. at 12. Once again, the court cannot agree with Plaintiff's strained reading of the record.

As Plaintiff acknowledges, the ALJ summarized the eye treatment received:

The medical evidence establishes that the claimant was evaluated on February 8, 2007 and found to have had a right retinal detachment, lattice degeneration and retinal holes for which she underwent surgical repair with scleral buckle and retinal cryopexy. Subsequently, the claimant's retina was noted to be attached with some macular edema and persistent vitreous debris. By September 2007, she was fitted with rigid gas permeable contact lenses and her visual acuity was corrected (Exhibit 3F [(R. 262-93)]).

10

However, she had problems with anisometropia (double vision) (Exhibit 4F [(R. 294-311)]).  She then had correction with toric contact lenses of the double vision but then had aniseikona symptoms (Exhibit 5F [(R. 312-17)]).

Accordingly, her contact lenses were not tolerated and she wore only one for the better eye.  In March 2008, it was recommended that she wait for stabilization post retinal surgery and after pregnancy when hormones can cause vision fluctuations before considering photorefractive keratectomy (PRK) (Exhibit 6F [(R. 318-21)]).  In April 2010, the claimant was evaluated for surgery photorefractive keratectomy (PRK) or implantation surgery and it was found to be possible but was not recommended.  It was his recommendation that she use glasses or rigid gas permeability to provide her with functional visual acuity.  She was noted to have 20/30 right and 20/25 left with glasses or contact lenses and 20/25 together (Exhibit 9F [(R. 326-35)]).

(R. 15).  The court's review of the record reveals that the ALJ's summary is a fair summary of the course of Plaintiff's treatment and is supported by the record evidence.

The only problem Plaintiff asserts with the summary is that anisometropia ("A difference in the refractive power of the two eyes"[5]) is not "double vision" as asserted by the ALJ, and causes more symptoms than just double vision in Plaintiff, but also causes headaches, blurred vision in both eyes, and bright flashes of light.  She argues that because the ALJ misunderstood anisometropia, she did not consider all of these symptoms.  Plaintiff has not shown that it was error for the ALJ to equate anisometropia with double vision.

The ALJ is not a medical professional, and she is not expected to note every nuance and fine distinction in medical terminology.  "Refraction" is "The deflection of a

---

[5]Stedman's Medical Dictionary, 92 (26th Ed. 1995).

ray of light when it passes from one medium into another of different optical density."
Stedman's Medical Dictionary, 1520 (26th Ed. 1995).  Therefore, a difference in
refractive power between two eyes would suggest to a layman such as this court and the
ALJ that each eye bends light a different amount when focusing the light, resulting in
double vision.  Moreover, one of Dr. Schelm's records cited in Plaintiff's brief tends to
confirm that anisometropia causes double vision in Plaintiff.  In a "To Whom It May
Concern" letter dated April 5, 2010, Dr. Schelm noted that Plaintiff has "anisometropia
(large difference in the power of the two eyes which can make it difficult for the brain to
combine the picture from each eye)."  (R. 343).  In the very next paragraph Dr. Schelm
stated that Plaintiff "can refract with glasses to 20/30- in the right eye [(the eye which had
the retinal detachment repair)] and 20/20 in the left eye, but she cannot fuse the 2 images
of the eyes, meaning that with her best correction, she has double vision."  (R. 343)
(emphasis added).  The understanding a lay person such as the ALJ and this court would
naturally garner from Dr. Schelm's explanation is that anisometropia causes double
vision, at least in Plaintiff.  The court finds that the record evidence supports the ALJ's
determination that, at least in this case, anisometropia equates to or causes double vision.

As an aside, the court also notes that in her letter Dr. Schelm stated that she did not
know if Plaintiff would ever be able to return to her previous job.  That opinion tends to
confirm the ALJ's finding that Plaintiff is unable to return to her past work, but it does
not say that Plaintiff is unable to perform other work existing in the economy.

As Plaintiff argues, other treatment records document Plaintiff's additional reports of headaches and blurry vision (R. 308, 309), and that she twice saw "really bright flashes of light." (R. 347). However, none of the treatment notes cited by Plaintiff directly links the reported symptoms to anisometropia. As quoted and discussed above, the decision reveals that the ALJ considered Plaintiff's treatment records for her eye problems. The ALJ also specifically discussed double vision and headaches. And Plaintiff points to no evidence demonstrating that the ALJ did not adequately consider those symptoms. As to the occasional reports of blurry vision and flashes of light, Plaintiff points to no evidence that they are continuous or that they cause limitations in addition to those included in the RFC assessment by the ALJ. Moreover, the fact that Plaintiff drives suggests that these symptoms are not continuous and do not cause limitations in addition to those included in the RFC assessed.

The record must demonstrate that the ALJ considered all of the evidence, but the ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects. Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996). Plaintiff has not shown that the symptoms which were not specifically discussed in the decision are uncontroverted or significantly probative.

### C. Evaluation of Dr. Burns's Opinion Regarding Visual Limitations

Plaintiff notes that her primary care physician, Dr. Burns, opined that she could use her vision for less than five minutes at a time, and not repetitively.  (Pl. Br. 12).  She acknowledges that the ALJ discounted Dr. Burns's opinion, but argues that it was error to discount the opinion because the reasons given are not supported by the record evidence.  The Commissioner argues that there is no merit to Plaintiff's contention that Dr. Burns's opinion should have been given greater weight, and that the ALJ's reasons for discounting Dr. Burns's opinion are supported by substantial record evidence.  (Comm'r Br. 10-11).

As Plaintiff's brief suggests, a treating physician is expected to have greater insight into the patient's medical condition, and his opinion may be entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [claimant's] case record."  20 C.F.R. § 404.1527(d)(2); see also, SSR 96-2p, West's Soc. Sec. Reporting Serv., Rulings 111-15 (Supp. 2012) ("Giving Controlling Weight to Treating Source Medical Opinions").  A treating source opinion is generally entitled to "particular weight" even if not accorded controlling weight.  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).  When a treating source opinion is not accorded "controlling weight," the ALJ must nonetheless specify the weight accorded to the opinion.  Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th 2004).

Here, the ALJ expressed her evaluation of Dr. Burn's opinion:

14

> The claimant's treating physician in a statement dated April 26, 2010 indicated that the claimant can see rarely (less than 5 minutes at a time) not repetitiously for near, far, or depth perception (Exhibit 12F [R. 351-54]). Little weight is given to this opinion.  However, he has done no visual examination to substantiate these limitations.  The claimant has not been documented to have such restrictive limitations elsewhere in the record. Moreover, his opinion is inconsistent with the claimant's activities, including driving a car.

(R. 15).  This evaluation reveals that Dr. Burns's opinion was not given controlling weight both because it is not well-supported and because it is inconsistent with the other record evidence.  It also reveals that the opinion was given "little weight" for the three reasons listed:  Dr. Burns did no vision examination of Plaintiff, no other record evidence documents such restrictive limitations, and the opinion is inconsistent with Plaintiff's activities, including driving.

Plaintiff attacks the first reason, arguing that although Dr. Burns did no vision examination of Plaintiff, he "did receive updates of Garcia's condition from the eye specialists," (Pl. Br. 12) (citing R. 286, 288, 396, 414), and it is "reasonable to assume that Dr. Burns then reviewed the copies of the examinations before opining on Garcia's visual limitations."  (Reply 2).  This argument fails for several reasons.  First, Plaintiff does not demonstrate that Dr. Burns in fact <u>received</u> updates regarding Plaintiff's eye condition.  There is no evidence of these updates in Dr. Burns's treatment records, and the portions of the records to which Plaintiff cites are from the eye specialists' notes, suggesting that Dr. Burns was provided a "carbon copy" of the updates which were addressed to Dr. Schelm, but they do not show that the updates were received by Dr.

15

Burns.  Second, even if Plaintiff had been successful in showing that Dr. Burns's opinion was based merely on review of the specialists' reports, that opinion would be a "non-examining source" opinion and not a treating source opinion in so far as it relates to Plaintiff's vision, and that fact itself would serve to discount Dr. Burns's opinion.  Finally, Plaintiff has not shown that Dr. Burns's opinion is sufficiently similar to the eye specialists' opinions to be based upon them.

Plaintiff argues that the ALJ's finding that such restrictive limitations are not documented elsewhere in the record is an insufficient reason because "limited vision is documented throughout" the record.  (Pl. Br. 13).  Plaintiff cites to record evidence of her reports of blurry vision, of seeing double, and of floaters, and notes that Dr. Schelm found Plaintiff has decreased vision and boor binocularity.  Id.  Plaintiff is correct to note that the record documents limitations in her vision.  However, as the ALJ found, the "limited vision" documented elsewhere in the record evidence is not "such restrictive limitations" as opined by Dr. Burns--limiting Plaintiff to seeing less than five minutes at a time, and even then not repetitively.

Plaintiff argues that her driving is not inconsistent with Dr. Burns's opinion as the ALJ found.  She testified that she drives very short distances which is "consistent with Dr. Burns's opinion that Garcia should only use her vision for five minutes at a time." (Pl. Br. 13) (citing R. 29).  The court finds this argument frivolous.  Plaintiff did not testify that she drives "very short distances," or that she drives such as to use her eyes only for five minutes at a time.  Rather, she testified that her driving is "limited" and that

16

she drives only "[b]asically [to] the grocery store and when my son's in school I pick him up." (R. 29). Even assuming that both the grocery store and Plaintiff's son's school are within a five-minute drive of Plaintiff's residence, that begs the question of whether Plaintiff is using her eyes in preparing for these trips, and whether she is using her eyes "repetitively" when she goes into the grocery store to shop, or when she makes the return trip home. The court can imagine no responsible adult and mother who would subject the public, and especially her child, to the danger which would be inherent in such activity if she were truly limited to using her eyes five minutes at a time. The court will not assume Plaintiff is so irresponsible.

## IV.     The Credibility Determination

Plaintiff argues that she is a credible witness, and that the evidence does not support the ALJ's credibility finding. Specifically, she argues that the ALJ's reliance on the lack of current evidence of mental impairment is erroneous because she alleges that her vision, and not her depression, is disabling; that contrary to the ALJ's finding of recent headaches, she reported headaches in 2007; that her daily activities on balance do not support a finding of incredibility; and that her receipt of long-term disability benefits has no bearing on her credibility. The Commissioner argues that substantial record evidence supports the reasons given by the ALJ to discount the credibility of Plaintiff's allegations of disabling symptoms. The court finds no error in the ALJ's credibility determination.

### A.     The ALJ's Evaluation of Credibility

17

The ALJ discussed her credibility evaluation:

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

In terms of the claimant's alleged impairments, I note that there is no evidence of any mental impairment except for before her alleged onset date when she first was prescribed an antidepressant.  The medical source opinion from Dr. Burns is not supported by the evidence of record or his own medical records.  The claimant related having headaches but that they only started in May 2010.  She has only taken over the counter medications.  She has only seen a family physician for her headaches.  With respect to her activity level, there was no testimony that she had increased limitations in her daily activities.  She engages in a wide range of activities including caring for a one year old and ten year old, household tasks except for cutting, and still drives at least short distances.  The claimant testified that she is receiving long-term disability in the amount of $1500 per month for a five-year period based on her inability to do her past work.  This provides her very little incentive to work at this time.  The overwhelming medical evidence documents that the claimant has restricted vision on the right but that she maintains corrected vision to normal in the left eye.  She has constricted right visual field, poor color vision and no or poor depth perception (Exhibit 17F [(R. 423-28)]).

(R. 17).  The court finds that in this evaluation the ALJ provided six reason to discount the credibility of Plaintiff's allegations of symptoms.  There is no evidence of mental impairment after Plaintiff's alleged onset date; Plaintiff's alleged headaches only started in May 2010, about a month before her disability hearing; Plaintiff has taken only over-the-counter medications; Plaintiff engages in a wide range of daily activities and has not testified of increased limitations in activities; Plaintiff's receipt of long term disability

payments provides very little incentive to work; and, although Plaintiff has restricted

vision in her right eye, vision in her left eye is corrected to normal.

### B.    Standard for Evaluating Credibility

An ALJ's credibility determinations are generally treated as binding on review.

Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990); Broadbent v. Harris, 698 F.2d

407, 413 (10th Cir. 1983).  "Credibility determinations are peculiarly the province of the

finder of fact" and will not be overturned when supported by substantial evidence.

Wilson, 602 F.3d at 1144; accord Hackett, 395 F.3d at 1173.  Therefore, in reviewing the

ALJ's credibility determinations, the court will usually defer to the ALJ on matters

involving witness credibility.  Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994); but

see Thompson v. Sullivan, 987 F.2d 1482, 1490 (10th Cir. 1993) ("deference is not an

absolute rule").  "However, '[f]indings as to credibility should be closely and

affirmatively linked to substantial evidence and not just a conclusion in the guise of

findings.'" Wilson, 602 F.3d at 1144 (quoting Huston v. Bowen, 838 F.2d 1125, 1133

(10th Cir. 1988)); Hackett, 395 F.3d at 1173 (same).

### C.    Analysis

As Plaintiff argues, she has always asserted that her vision impairment is disabling

and has not alleged disability due to mental impairments.  (R. 166).  Therefore, the ALJ's

reliance on the lack of current medical evidence of mental impairment is a very weak

reason to discount Plaintiff's allegations of symptoms.  However, the ALJ's assertion in

that regard is correct and is supported by the record evidence.  Perhaps the ALJ focused

19

on this factor because it appears as the first medical evidence in the record both

temporally (December 11, 2006), and by position (Ex. 1F).  (R. 250).  The ALJ may have

focused on this evidence because it was presented by Plaintiff's primary care physician,

Dr. Burns, and the ALJ found herself repeatedly explaining in the decision at issue why

Dr. Burns's records were not helpful in considering disability.  (R. 13-14) (Dr. Burns's

mental assessment was not supported by the record); (R. 15) (Dr. Burn's physical

assessment was worthy of little weight); (R. 17) (although the ALJ requested current

records from Dr. Burns, none were presented and Dr. Burns's opinions were not

supported by his own records or by the other evidence).  In any case, the ALJ's discussion

of the lack of current evidence of mental impairment and of Dr. Burns's opinion appears

as an aside in the credibility rationale, is technically correct, and does not seem to be a

great factor in the credibility evaluation, so the court finds no reversible error.

Plaintiff next argues that contrary to the ALJ's finding of only recent headaches,

she reported headaches in 2007.  Again, Plaintiff is correct that on her three-month

followup with Dr. Rosenthal after surgery she reported she was very light sensitive which

was causing headaches.  (R. 269).  Other than that, the court's extensive search of the

medical records revealed only two other reports of headaches.  On September 9, 2007

during the period when Dr. Schelm was attempting to fit contact lense which would

correct double vision and anisometropia, she reported to Dr. Schelm that her contact

lenses from the last time were giving her headaches.  (R. 308).  Again, on January 23,

2008, at a one-week contact lens check Plaintiff reported to Dr. Isern that she develops

20

headaches behind her eyes after three hours of wearing those contact lenses.  (R. 411).  At the hearing, on June 28, 2010, the ALJ asked counsel for an opening statement, and in her statement she asserted that Plaintiff "recently started experiencing headaches as her eyes have tried to focus and correct" the problem of unequal images and double vision.  (R. 28).  Later at the hearing, in response to questioning by the ALJ Plaintiff testified that "around the end of May" she began having a throbbing in the back of her eyes if she watches TV for an hour or if she is outside.  (R. 40).  In light of the slender evidence of three reported headaches between February, 2007 and May, 2010 and Plaintiff's testimony and opening statement at the hearing, the court finds no reversible error in the ALJ's finding that Plaintiff began having headaches in May, 2010.  The error, if any, was invited by Plaintiff and her counsel.

Plaintiff argues that the ALJ improperly considered her daily activities in discounting the credibility of her allegations.  Specifically, she argues that she cannot drive far or at night; cannot use a computer, scissors, or a knife; has problems with sleep because of headaches; and has problems with the quality of her tasks.  (Pl. Br. 17).  Plaintiff's argument misses the fact that the RFC assessed by the ALJ accommodates each of the deficiencies noted, and that the activities upon which the ALJ specifically relied to discount Plaintiff's allegations of disabling symptoms were caring for a one-year-old and a ten-year-old, performing household tasks except for cutting, and driving at least short distances.  Despite the limitations asserted by Plaintiff and acknowledged by the ALJ, the

fact that Plaintiff performs these activities is evidence supporting the ALJ's finding that Plaintiff's visual impairment is not as limiting as alleged by Plaintiff.

Finally, Plaintiff argues that the ALJ erred in finding that Plaintiff has decreased motivation to work because of the receipt of long-term disability benefits, and that she erred in discounting the credibility of her allegations on that basis.  Plaintiff admits that the Tenth Circuit has not addressed the specific issue of receipt of private disability benefits, but argues that the principal is the same as that relied upon by the court in Hinton v. Massanari, 13 F. App'x 819, 820[6] n.1 (10th Cir. 2001) wherein the court noted that it was "improper" for an ALJ to find that money received or that might be received from workers' compensation would provide less motivation to work.  The Hinton court found this was so because "Congress drafted the social security statutes with the expectation that claimants could receive both workers' compensation and disability benefits for on-the-job injuries."  Hinton, 13 F. A'ppx at 820 n.1 (citing 42 U.S.C. § 424a; and Richardson v. Belcher, 404 U.S. 78, 82-83 (1971)).

Hinton is not controlling precedent in this case for several reasons.  First, Hinton is an unpublished opinion and has a footnote specifically stating that it is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  None of the exceptions mentioned applies here.  Second, the principal to which

[6]Although Plaintiff cites to footnote 1 on page 821, and although the footnote itself appears in Westlaw.com after the page break between 820 and 821, the court notes that the reference to footnote 1 actually appears in the text at page 820.

Plaintiff appeals is found in <u>Hinton</u> only in a footnote and was not specifically relied upon by that court in finding that Ms. Hinton's allegations of disabling pain were credible, and as such is merely <u>dictum</u> not binding on this court.  <u>Hinton</u>, 13 F. App'x. at 821-23. Third, the principal discussed in <u>Hinton</u> was based upon two government programs where the law indicated Congress's intent that both programs would be available for a single on-the-job injury.  Here, Plaintiff points to no law indicating Congress's intent that a claimant should receive both private long term disability payments and social security benefits.  And, here Plaintiff alleges no on-the-job injury justifying receipt of both benefits.

Finally, the authority upon which the <u>Hinton</u> court relied does not support application of the same principal here.  The Act, as cited in <u>Hinton</u>, provides that both workers' compensation benefits and social security benefits are payable for on-the-job injuries, but it provides that the total amount of such benefits received from both sources shall be limited by certain considerations.  42 U.S.C. § 424a.  That law says nothing regarding receipt of private long-term disability payments.  <u>Id.</u>  <u>Richardson v. Belcher</u>, the other authority cited by the <u>Hinton</u> court, was a case in which the Supreme Court upheld the constitutionality of the section of the Act which provided for limitation on the total amount of benefits from the two programs.  <u>Belcher</u>, 404 U.S. at 78.  Belcher argued that the Act was unconstitutional "because it discriminates between those disabled employees who receive workmens' compensation and those who receive compensation

from private insurance or from tort claim awards." <u>Id.</u> at 81.  The Court responded, "We cannot say that this difference in treatment is constitutionally invalid." <u>Id.</u>

The principal in <u>Hinton</u> was specifically limited to consideration of receipt of workers' compensation and was based upon Congress's specific decision to allow limited receipt of both workers' compensation and social security benefits.  As the Court noted in <u>Belcher</u>, Congress's decision not to include private payments in the same scheme is not unconstitutional.  Moreover, as the ALJ noted, Plaintiff's receipt of $1,500 a month in long-term disability benefits tends to reduce her incentive to work, and is a reason to discount the credibility of her allegations of disabling symptoms.

Plaintiff has shown no error in the ALJ's credibility evaluation.  The court's review of an ALJ's credibility determination is deferential, and as the Commissioner points out, the reviewing court's responsibility "is to determine whether the ALJ's credibility determination is sufficiently detailed and supported by substantial evidence.  The fact that he may have missed, ignored, or misunderstood certain evidence that might support [Plaintiff]'s claims of disabling [symptoms] does not mandate reversal as long as, on the whole record, substantial evidence supports his credibility determination." <u>Shubargo v. Barnhart</u>, 161 F. App'x 748, 753 (10th Cir. 2005).  The court finds that substantial evidence on the whole record supports the ALJ's credibility determination in this case.

Plaintiff has shown no error in the decision below.

24

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

Dated this 11th day of December 2012, at Kansas City, Kansas.


s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**